IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DIANNE S. REGANICK,               )
                                  )
        Plaintiff,                )
                                  )
    v.                            )
                                  )    Civil Action No. 06-1267
SOUTHWESTERN VETERANS'            )
CENTER, CHARLES RHODES, MARY      )
LOU YURKO, JAMES REYNOLDS,        )
THOMAS RETTINGER, TERI            )
LEWALL, and JEFFREY COBBS,        )
                                  )
        Defendants.               )

MEMORANDUM and ORDER

Gary L. Lancaster,
District Judge.                          March 19, 2008

        This is an action in employment discrimination.
Plaintiff, Dianne Reganick, alleges that defendant, Southwestern
Veterans' Center ("SWVC"), discriminated against her based upon her
sex, race, and age and retaliated against her in violation of Title
VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, et seq.
("Title VII"), the Age Discrimination in Employment Act of 1967, as
amended, 29 U.S.C. § 621, et seq. ("ADEA"), and the Pennsylvania
Human Relations Act, 43 P.S. § 951, et seq. ("PHRA"). Plaintiff
further alleges that the individual defendants aided and abetted in
SWVC's discrimination and retaliation in violation of the PHRA.
Plaintiff seeks money damages.

        Defendants have filed an omnibus motion for summary
judgment. [Doc. No. 21]. For the reasons discussed below, the
motion will be granted.

I.   BACKGROUND

Unless otherwise indicated, the facts set forth below are undisputed.

Plaintiff, a caucasian woman in her late forties, began working at SWVC as a licensed practical nurse ("LPN") on October 24, 2005. One of her job duties was supervising certified nursing assistants ("CNA's"). On December 5, 2005, plaintiff wrote up defendant CNA Jeffery Cobbs, a younger, African-American male, for failing to properly care for a patient. In her December 5th witness statement, plaintiff indicated that defendant Cobbs had been argumentative with the patient and resisted plaintiff's instructions regarding the patient's care.[1] Consequently, SWVC initiated an investigation and conducted a pre-disciplinary conference with defendant Cobbs on December 13, 2005 which resulted in a written reprimand.

Plaintiff alleges that shortly after the December 5, 2005 incident, defendant Cobbs began following plaintiff at work, staring at her in a frightening and suggestive manner, and otherwise intimidating her. Plaintiff requested that she be reassigned to a different floor so that she could get away from

---

[1]

In her deposition, plaintiff testified that during the patient incident as well as on other occasions, defendant Cobbs told her that he does not "listen to white women." [Doc. No. 21-4, pp. 24]. Plaintiff, however, does not mention this specific race/gender comment by defendant Cobbs in her December 25, 2005 letter to defendant Charles Rhodes or in her EEOC charge.

2

him, but this initial request was denied.

On December 25, 2005, plaintiff wrote a letter to defendant Charles Rhodes, SWVC Commandant, complaining that defendant Cobbs was harassing her. [Doc. No. 21-4, pp. 2-3]. Plaintiff wrote that defendant Cobbs had been "denying authority, making rude comments to me ... and intimidating me." Id. Plaintiff wrote that Defendant Cobbs told another employee that, "I was 'lying slime' and that I would 'get mine.'" Plaintiff stated in her letter that she would like to move to another floor, away from defendant Cobbs, as she feared for her safety. Id. Plaintiff met with defendant Rhodes the same day that she submitted the letter. Immediately after meeting with defendant Rhodes, plaintiff was assigned to another floor, away from defendant Cobbs.[2]

As a follow-up to her meeting with defendant Rhodes, plaintiff met with Business Manager Richard Walters[3] and Personnel Director Linda Moninger on December 29, 2006. Plaintiff explained, inter alia, that defendant Cobbs was picking assignments so that he

---

[2]

The facts of record indicate that plaintiff no longer supervised defendant Cobbs after December 25, 2005.

[3]

There appears to be some confusion in the record as to the identity of SWVC's Business Manager. Although plaintiff identified David Matthews as the Business Manager during her deposition, Richard Walters signed and submitted a witness statement from the December 29, 2006 follow-up meeting, SWVC identified Richard Walters as the Business Manager during plaintiff's unemployment compensation hearing, and Linda Moninger's notes from the meeting indicate that Richard Walters was present.

3

would be on her wing, that he told another RN that plaintiff didn't know anything, that he told another employee that plaintiff was "lying slime," and that Defendant Cobbs was purposefully parking his car next to hers.[4] [Doc. No. 21-4, pp. 40-42]. Plaintiff also complained that one evening in the parking lot, Defendant Cobbs made remarks about her to CNA Jamie Paletta. Id. Finally, plaintiff expressed her frustration that she was writing witness statements but nothing was happening. Id.

During this meeting, it was decided that plaintiff and defendant Cobbs would be separated on different units as much as possible. [Doc. No. 21-4, pp. 40-42]. Ms. Moninger and Mr. Walters offered plaintiff security escorts to her car and advised plaintiff to keep submitting witness statements if the problems with defendant Cobbs persisted. Mr. Walters interviewed Mr. Paletta about the parking lot incident, but Mr. Paletta indicated that he did not know anything about it. Id.

Also as a result of the December 29, 2006 meeting, defendant Cobbs was instructed to stay away from plaintiff. According to plaintiff, despite this instruction, defendant Cobbs continued to come to plaintiff's floor during her shift and wait

---

[4] Defendant Cobbs' alleged comment that he does not "listen to white women" is not mentioned in Ms. Moninger's or Mr. Walter's notes from plaintiff's December 29, 2005 meeting; their notes indicate that plaintiff told them that Defendant Cobbs's "said she [plaintiff] didn't know anything," and make no reference to plaintiff's race or gender.

for plaintiff in the parking lot. During these encounters, he did not touch plaintiff or verbally harass her in any way. In fact, defendant Cobbs did not speak to plaintiff during January and February of 2006. According to plaintiff, however, he did continue to stare at her in a suggestive and threatening manner.

On or about January 7, 2006, plaintiff complained to her supervisor, Cindy Fletscher, that defendant Cobbs had purposefully moved his car and parked it next to plaintiff's. Ms. Fletscher notified security and told plaintiff to park her car next to Ms. Fletscher's so that it would be under the security camera. About an hour later, Ms. Fletscher assembled the nursing staff on plaintiff's unit and said that defendant Cobbs was stalking plaintiff and that plaintiff should not be left alone. Plaintiff was escorted to her car by security at the end of her shift that night and was permitted to park her car in a no-parking zone in front of the building.

In an attempt to resolve the issues between plaintiff and defendant Cobbs, on January 9, 2006, defendants Tom Rettinger (Assistant Director of Nursing) and Terri Lewall (Director of Nursing) met with plaintiff to see if she would agree to participate in a meeting with defendant Cobbs. Plaintiff refused.

Soon thereafter, defendant Cobbs was transferred to the same shift as plaintiff and the same floor as Plaintiff. Defendant Rettinger counseled plaintiff that she would have to act

5

professionally if she and defendant Cobbs ran into each other.

On January 20, 2006, plaintiff submitted a witness statement alleging that a co-worker (later identified as Roosevelt Scott) told her that defendant Cobbs had threatened to "fuck her up" if she didn't "quit fucking with him." [Doc. No. 21-4, p. 12]. Cindy Fletscher interviewed Roosevelt Scott who insisted that he jokingly told plaintiff that, "Jeff Cobbs was going to jack her up." Mr. Roosevelt submitted a witness statement indicating that he was "just clowning around." [Doc. No. 21-5, p. 2-3].

Plaintiff submitted another witness statement on January 26, 2006, complaining that defendant Cobbs came to her unit to "make his presence known." [Doc. No 21-4. P. 13]. She included in this witness statement the scolding she received from defendant and Registered Nurse Supervisor Jim Reynolds who told her "not to call him any more about Jeff Cobbs unless Jeff hurt [her] physically or verbally abused [her]." Id.

On February 3, 2006, plaintiff submitted her final witness statement regarding an alleged threat made by defendant Cobbs that she heard about through co-worker Mary Ann Knuckles. According to plaintiff, Ms. Knuckles informed her that she should "watch her back" because Ms. Knuckles had heard from another staff member that defendant Cobbs was going to kill plaintiff. [Doc. No. 21-5, p. 12]. Plaintiff reported this threat to Cindy Fletscher and wrote another letter to defendant Rhodes. [Doc. No. 21-4, pp.

6

4-5]. SWVC's Human Resources Director defendant Mary Lou Yurko immediately initiated a workplace violence investigation. [Doc. No. 21-5, pp. 8-11]. During her interview with defendant Yurko, Ms. Knuckles denied ever telling plaintiff that she had heard that defendant Cobbs was going to kill her. [Doc. No. 21-5, pp. 13-15]. Ms. Knuckles stated that she did not hear anyone say that defendant Cobbs wanted to kill plaintiff and explained that she told plaintiff to watch her back because neither she nor plaintiff knew him. Id.

As part of the investigation, LPN Rebecca Dewitt, RN Diane Hallett, and LPN Jodi Borchert submitted witness statements and were interviewed by defendant Yurko. [Doc. No. 21-5, pp. 16-18]. All three indicated that they had no complaints about defendant Cobbs' work or his attitude. Id. Additionally, defendant Yurko interviewed defendant Cobbs who denied ever telling anyone that he was going to kill plaintiff and denied purposely parking his car next to plaintiff's. [Doc. No. 21-5, pp. 19-21].

On February 9, 2006, plaintiff was called to a meeting with defendant Rettinger and Linda Moninger. The meeting began as an informal interview regarding a patient's medication. During the meeting, plaintiff indicated that she had been informed that the patient had left the facility, during the previous shift, without his medication. When plaintiff admitted that she failed to act on this information, the interview became a pre-disciplinary

conference regarding plaintiff's failure to act.

Plaintiff submitted her letter of resignation the following day, February 10, 2006.

## II. <u>STANDARD OF REVIEW</u>

Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986) (internal quotation marks omitted). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. <u>Id</u>. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. <u>Id</u>. at 248-49.

To demonstrate entitlement to summary judgment, defendants, as the moving parties, are not required to refute the essential elements of the plaintiff's cause of action. Defendants

need only point out the absence or insufficiency of plaintiff's evidence offered in support of those essential elements. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Once that burden has been met, plaintiff must identify affirmative evidence of record that supports each essential element of his cause of action. If plaintiff fails to provide such evidence, then he is not entitled to a trial, and defendants are entitled to summary judgment as a matter of law.

It is on this standard that the court has reviewed the instant motion for summary judgment and the response thereto. Based on the pleadings and evidence of record, and the briefs filed in support and opposition thereto, the court concludes that defendants are entitled to judgement as a matter of law.

III. DISCUSSION

Plaintiff claims that SWVC subjected her to disparate treatment as well as a hostile work environment based upon her sex, race, and age in violation of Title VII, the PHRA and the ADEA. Plaintiff further alleges that she was constructively discharged and that SWVC retaliated against her after she complained of defendant Cobbs' harassment. Finally plaintiff claims that the individual defendants aided and abetted SWVC in committing the aforementioned discriminatory and retaliatory acts in violation of

the PHRA.

Although plaintiff alleges that SWVC's actions violated three separate statutes, the legal standards for determining plaintiff's discrimination and retaliation claims are the same under Title VII, the PHRA, and the ADEA.   See  Weston v. Pennsylvania, 251, F.3d 420, 426 n.3 (3d Cir. 2001) (holding that the analysis under Title VII and the PHRA is identical); Sarullo v. U.S. Postal Service, 352 F.3d 789, 797-98 (3d Cir. 2003) (employing the same analysis for plaintiff's Title VII and ADEA discrimination claims).   Therefore, the court will analyze plaintiff's disparate treatment, hostile work environment and retaliation claims under Title VII, and the conclusions will apply equally to her claims under the PHRA and the ADEA.

A.   Disparate Treatment

In a disparate treatment action, a plaintiff must first establish a prima facie case of discrimination.   Williams v. Giant Eagle Markets, Inc., 883 F.2d 1184, 1191 (3d Cir. 1989)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).   In order to set forth a prima facie case of discrimination, plaintiff must demonstrate: (1) she is a member of a protected class; (2) she was qualified for the positions sought or held; (3) she suffered an adverse employment action despite being qualified; and (4) similarly situated persons who are not members of the protected

10

class were treated more favorably.[5] <u>McDonnell Douglas Corp.</u>, 411
U.S. at 802; <u>Jones v. Sch. Dist. Of Phila.</u>, 198 F.3d 403, 410-11
(3d Cir. 1999).

With regard to the third element, an "adverse employment
action" is an action that is "serious and tangible enough to alter
an employee's compensation, terms, conditions, or privileges of
employment." <u>Storey v. Burns Intern. Security Services</u>, 390 F.3d
760, 764 (3d Cir. 2004) (noting that the definition of an adverse
action stems from the language of Title VII itself which states
that "[i]t shall be an unlawful employment practice for an employer
... to discriminate against an individual with respect to his
compensation, terms, conditions, or privileges of employment, ..."
42 U.S.C. § 2000e-2(a)(1)).

The only adverse employment action identified by
plaintiff is the February 9, 2006 pre-disciplinary conference.
There is no evidence, however, that this conference altered
plaintiff's compensation or the terms, conditions, or privileges of
her employment. In fact, because plaintiff resigned the day after
the conference, there is no evidence that the meeting had any
impact whatsoever on her job. While they may be unpleasant,

---

[5]
As plaintiff is white, her race discrimination claim is actually a
reverse-race discrimination claim. The <u>prima</u> <u>facie</u> case, however,
is the same for a reverse-race discrimination claim as it is for a
race discrimination claim. <u>See</u> <u>Iadimarco v. Runyon</u>, 190 F.3d 151,
160-61 (3d Cir. 1999).

conferences like the one alleged by plaintiff, where no harm or
injury results, do no constitute adverse employment actions.  See,
e.g., Nagle v. RMA, 513 F.Supp.2d 383, 391 (E.D. Pa. 2007) (holding
that a "heated" 65 minute meeting with superiors which caused
plaintiff to believe her career "was over" did not constitute an
adverse employment action); Davis v. Town of Lake Park, Fla., 245
F.3d 1232, 1241 (11th Cir. 2001) ("criticisms of an employee's job
performance - written or oral - that do not lead to tangible job
consequences will rarely form a permissible predicate for a Title
VII suit") (collecting authorities).

        Because plaintiff has failed to demonstrate that she has
suffered an adverse employment action, she cannot set forth a prima
facie case of discrimination on the basis of her age, race or sex.
Consequently, plaintiff's disparate treatment claims fail as a
matter of law.[6]

B.    Hostile Work Environment

        Plaintiff claims that Jeff Cobbs' harassment caused her
to be subjected to a hostile work environment based upon her age,
race, and sex.    In order to state a claim for discrimination

---

6

Although plaintiff has not raised the argument, a constructive
discharge may constitute an adverse employment action for purposes
of setting forth a prima facie case of discrimination.  See Hill v.
Borough of Kutztown, 455 F.3d 225, 247 (2006).  In any event, for
the reasons stated infra, the evidence of record fails to support
a constructive discharge claim.

12

resulting from a hostile work environment, plaintiff must show: (1) she suffered intentional discrimination because of her age, race, and/or sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same sex, race, or age in that position; and (5) the existence of respondeat superior liability.[7] Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007) (citing Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001)).

Title VII protects only against harassment based on discrimination against a protected class; it is not "a general civility code for the American workplace." Oncale v. Sundower Offshore Servs., 523 U.S. 75, 80-81 (1998). Accordingly, with regard to the first element of her hostile work environment claim, plaintiff must show that defendant Cobbs' conduct was motivated by animus based on plaintiff's age, race, and/or sex.

---

[7]

While the Court of Appeals for the Third Circuit has not specifically held that a hostile work environment claim is available under the ADEA, one unpublished Third Circuit decision as well as numerous district court decisions have assumed the viability of such a claim. See, e.g., Watcher v. Pottsville Area Emergency Med. Services, Inc., 248 Fed. Appx. 272, 279 (3d Cir. Sept. 18, 2007); Whitesell v. Dobson Communications, No. 06-0319, 2008 WL 474270, * 15 (W.D. Pa. Feb. 20, 2008) (slip opinion); Fries v. Metropolitan Mgmt. Corp., 293 F.Supp.2d 498, 504 (E.D. Pa. 2003); Glanzman v. Metropolitan Mgmt. Corp., 290 F.Supp.2d 571, 581 (E.D. Pa. 2003); Tumolo v. Triangle Pac. Corp., 46 F.Supp.2d 410, 412 n. 2 (E.D. Pa. 1999).

13

With regard to the second element, the conduct in question must be severe and pervasive enough to create an "objectively hostile or abusive work environment – an environment that a reasonable person would find hostile - and an environment the victim-employee subjectively perceives as abusive or hostile." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The Supreme Court reinforced this requirement in Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), "[w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." In determining whether an environment is hostile or abusive, the court must look at numerous factors, including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

Plaintiff claims she was subjected to a hostile work environment based upon her age. There is no evidence, however, of any overtly ageist words or conduct by defendant Cobbs toward plaintiff. Plaintiff relies exclusively upon her own speculation that defendant Cobbs harassed her because of her age. Plaintiff's mere speculation is insufficient to prove age discrimination. See Bullock v. Children's Hosp. Of Phila., 71 F.Supp.2d 482, 490 (E.D. Pa. 1999). As such, plaintiff's ADEA claim based upon a hostile work environment fails.

14

In support of her Title VII claim, plaintiff points to the following racially and/or sexually hostile words and conduct by defendant Cobbs: (1) he stated on more than one occasion that he does not take orders from white women; and (2) he stared at her in a suggestive and threatening manner. Plaintiff also points to the following facially neutral conduct in support of her claim: defendant Cobbs refused to follow plaintiff's instructions when caring for patients and gave plaintiff a "hard time"; he would come to plaintiff's nurse's station to make his presence known; and he parked his car next to hers and would wait for her to come out of the hospital.[8]

Even if the evidence is sufficient for a jury to reasonably conclude that defendant Cobbs harassed plaintiff because of her sex and race, his alleged harassment of plaintiff was not sufficiently severe or pervasive to constitute a hostile work environment. As plaintiff claims the harassment began in December 2005 and she resigned on February 10, 2006, the harassment lasted

[8]

Plaintiff also complains of comments from other co-workers regarding defendant Cobbs' threats, intentions and/or remarks about plaintiff. None of these alleged statements by defendant Cobbs have been corroborated by any other witness. In fact, with regard to defendant Cobbs' alleged threat to "kill" plaintiff, Ms. Knuckles flatly denies that she ever told plaintiff that she had heard that defendant Cobbs made such a threat. Moreover, evidence relating to these incidents is hearsay and cannot be relied upon for purposes of summary judgment. Blackburn v. United Parcel Service, Inc., 179 F.3d 81, 95 (3d Cir. 1999) (hearsay evidence that would be inadmissible at trial should not be considered on a summary judgment motion).

15

for, at most, slightly over two months.  The evidence indicates
that SWVC removed defendant Cobbs from plaintiff's supervision as
soon as she complained to defendant Rhodes on December 25, 2005; as
such, any need for plaintiff and defendant Cobbs to interact on a
regular basis was eliminated within one month of plaintiff's first
complaint.  There is no evidence that defendant Cobbs ever touched
her.  In fact, plaintiff admits that he did not speak to her, or
even speak in her presence, in January or February of 2006.
Consequently, Jeff Cobbs' alleged statements that he "does not take
orders from white women" could only have been made during the month
of December 2005.

Plaintiff claims that defendant Cobbs "stalked" her by
showing up at her nurse's station and waiting for her in the
parking lot.  During these alleged "stalking" episodes, defendant
Cobbs did not touch her, speak to her, motion to her in a
threatening manner, or follow her by walking closely behind her.
He only stared at her in a manner that intimidated and frightened
plaintiff.  This conduct is insufficient as a matter of law to
support a hostile work environment claim.  See Bishop v. National
R.R. Passenger Corp., 66 F.Supp.2d 650, 664 (E.D. Pa. 1999)
(holding that acts "merely of staring, leering and [making] 'stud
muffin' comments, with no physical touching or threats and no
sexual overtones," are not severe enough to create a hostile work
environment); Mendoza v. Borden, Inc., 195 F.3d 1238, 1249 (11 Cir.

1999) (supervisor's "constant" following and staring for eleven months was not sufficiently severe or pervasive). Considering the totality of the circumstances, and viewing the facts in the light most favorable to plaintiff, a jury could not reasonably conclude that plaintiff's "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." Harris, 510 U.S. at 21.

Because the evidence of record is insufficient to establish the second element of plaintiff's Title VII hostile work environment claim, that claim fails as a matter of law as well.

C.    Constructive Discharge

Plaintiff claims that her resignation constitutes a constructive discharge. An employer may be liable for constructive discharge under Title VII. Pennsylvania State Police v. Suders, 542 U.S. 129, 143 (2004). In Suders, the Supreme Court stated that a hostile-environment constructive discharge claim "entails something more" than a hostile work environment claim, as it also requires the claimant to show "working conditions so intolerable that a reasonable person would have felt compelled to resign." Suders, 542 U.S. at 147. Plaintiff failed to substantiate an actionable hostile work environment claim; accordingly, she also fails to meet the more stringent requirements of a hostile-environment constructive discharge claim.

17

## D. Retaliation

"In order to prevail on a claim for retaliation under Title VII, an employee must prove that: (1) she engaged in protected employment activity; (2) her employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the adverse action and the protected activity." Andreoli, 482 F.3d at 649.

The February 9, 2006 pre-disciplinary conference fails to constitute an adverse action for plaintiff's Title VII discrimination claim. Plaintiff argues that it does constitute an adverse action under the less stringent definition which applies in Title VII retaliation claims. In Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, --, 126 S.Ct. 2405, 2415 (2006), the Supreme Court held that an adverse employment action, in the context of a retaliation claim, is an action which is "materially adverse." An action is "materially adverse" if "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Burlington, 126 S.Ct. at 2415. As the Supreme Court explained in Burlington Northern, "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 2414.

As discussed supra, the February 9, 2006 conference resulted in no harm to plaintiff whatsoever. Consequently, a reasonable jury could not find that the conference would have

18

"dissuaded a reasonable worker from making or supporting a charge of discrimination." See Burlington, 126 S.Ct. at 2414; see also Nagle, 513 F.Supp.2d at 391 (applying Burlington Northern). Plaintiff's retaliation claim, therefore, fails as a matter of law.

D.   PHRA Aiding and Abetting Claims

Plaintiff's remaining claims are PHRA "aiding and abetting" claims against the individual defendants. Plaintiff alleges that the individual defendants aided and abetted the discrimination, harassment, and retaliation against her by perpetrating a hostile work environment in violation of section 955(e) of the PHRA. See 43 Pa. Cons. Stat. § 955(e). Section 955(e) of the PHRA provides that it is illegal for any employee "to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice ..." 43 Pa. Con. Stat. § 955(e). Courts have thus held that an individual defendant can be held liable under the PHRA in his personal capacity if the individual is a supervisor and the plaintiff can demonstrate that the supervisor aided or furthered the employer's discriminatory practices. See, e.g., Dici v. Commonwealth of Pa., 91 F.3d 542, 552 (3d Cir. 1996).

Plaintiff brings this claim against various supervisory employees as well as defendant Cobbs. Because defendant Cobbs was not a supervisory employee, he cannot be held liable under section 955(e). See Dici, 91 F.3d at 552.

19

Plaintiff's section 955(e) claim against the remaining individual defendants fails because her discrimination and retaliation claims fail. Simply stated, there was no discrimination or retaliation for the individual defendants to aid and abet. See 43 Pa. Cons. Stat. § 955(e); see also Stepp v. Fairpoint Communications, Inc., 2007 WL 4248559, *9 (W.D. Pa. Nov. 30, 2007) (citing Kaniuka v. Good Shepherd Home, 2006 WL 2380387, *10 (E.D. Pa. Aug.15, 2006) (holding that "[i] ndividual defendants cannot violate PHRA section 955(e) when there is no corresponding section 955(a) violation by an employer to aid and abet"); Taylor v. Rodale, Inc., 2004 WL 1196145, *4 (E.D. Pa. May 27, 2004) (dismissing the section 955(e) claim against the individual defendant because there was no basis for relief against the employer)).

IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment will be granted. An appropriate order follows.

20

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DIANNE S. REGANICK,                )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )
                                   )    Civil Action No. 06-1267
SOUTHWESTERN VETERANS'             )
CENTER, CHARLES RHODES, MARY       )
LOU YURKO, JAMES REYNOLDS,         )
THOMAS RETTINGER, TERI             )
LEWALL, and JEFFREY COBBS,         )
                                   )
        Defendants.                )

ORDER

AND NOW, this __19__ day of March, 2008, upon

consideration of defendants' motion for summary judgment [Doc. No.

21] and plaintiff's responses thereto [Doc. Nos. 26, 30], IT IS

HEREBY ORDERED THAT defendants' motion for summary judgment is

GRANTED. The Clerk of Court is directed to mark this case closed.

BY THE COURT:

_____, J.

cc: All Counsel of Record